# IN THE SUPREME COURT OF IOWA

No. 20–0187

Submitted September 16, 2020—Filed November 20, 2020

**IOWA SUPREME COURT ATTORNEY DISCIPLINARY BOARD,**

Complainant,

vs.

**DAVID EBONG AKPAN,**

Respondent.

On review of the report of the Iowa Supreme Court Grievance Commission.

Grievance commission recommends suspension for violations of Texas ethical rules in the handling of an immigration matter. **ATTORNEY REPRIMANDED.**

Mansfield, J., delivered the opinion of the court, in which Christensen, C.J., and McDonald, Oxley, and McDermott, JJ., joined, and in which Appel, J., joined in part. Appel, J., filed an opinion concurring in part and dissenting in part. Waterman, J., took no part in the consideration or decision of the case.

Tara van Brederode and Wendell J. Harms (argued), for complainant.

David L. Brown (argued) and Tyler R. Smith of Hansen, McClintock & Riley, Des Moines, for respondent.

**MANSFIELD, Justice.**

This attorney disciplinary case with interstate dimensions involves an Iowa-licensed attorney who practiced immigration law in Texas. The attorney received payments totaling $4000 from a client on a flat-fee representation. He put those payments directly in his operating account. After the attorney had worked on the case for a while, the client changed her mind and decided not to go forward with the representation. The attorney refused to refund any of the payments or to provide an accounting. The client filed a complaint with the Iowa Supreme Court Attorney Disciplinary Board. The Board charged various violations of the Texas Attorney Disciplinary Rules of Professional Conduct. The matter went to a hearing before a division of the Iowa Supreme Court Grievance Commission. At the hearing, which occurred prior to the COVID-19 pandemic, the client was allowed to testify by video over the attorney's objection. The commission found a number of violations and recommended a suspension.

On our review, we find that the attorney violated the Texas rules when he failed to deposit client payments in his trust account, took those payments as income before they were earned, and failed to provide accountings to his client. We are not persuaded, however, that the attorney violated Texas's prohibition on "unconscionable" fees when he collected $4000 for the work performed, which included many hours spent trying to get information from his client. We also believe the Board failed to show a sufficient basis for the admission of video testimony. As a sanction, we impose a public reprimand.

## I. Facts and Procedural History.

Attorney David Akpan is originally from Nigeria. He came to the United States in 1990 and became a United States citizen in 1994. In

1998, Akpan received a bachelor's degree in political science from Weber State University in Ogden, Utah. In 2003, Akpan graduated from Thurgood Marshall School of Law at Texas Southern University, located in Houston, Texas.

Akpan was admitted to the Iowa bar in 2010. Until 2017, Akpan practiced immigration law exclusively in Texas. Currently, he is winding down his immigration practice and does contract work in the Houston area for the United States Small Business Administration. Akpan is also admitted to the federal district courts in the Northern, Southern, and Eastern Districts of Texas.

In 2009, Akpan met Rosa Villatoro, who worked in the office of his tax preparer. Seven years later, in 2016, Villatoro hired Akpan for an immigration matter. Villatoro is a United States citizen; however, her husband is not. A native of El Salvador, he was in the United States on temporary protected status (TPS).

As Akpan later explained, "[TPS] is, while it's temporary in immigration law, it means it has an end eventually. Temporary in an immigration sense means it's not permanent residency, it's not an indefinite status." When the United States Secretary of Homeland Security determines that a country is no longer unsafe, a person on TPS from that country can be required to return there. Villatoro wanted Akpan to change her husband's immigration status to lawful permanent resident (green card). This involved preparing and filing a package of forms, including an I-130 form and an I-485 form.

Akpan and Villatoro met several times before a written fee agreement was signed. During one of these meetings, Akpan learned of an issue that could have posed an obstacle in the immigration matter. In 2015, Villatoro's husband had been arrested and charged with fraudulent

destruction of price tags, a misdemeanor under Texas law. The charge was resolved with a deferred adjudication, and Villatoro's husband was placed on probation. However, the offense was considered a crime of moral turpitude that could potentially prevent Villatoro's husband from obtaining permanent resident status. Akpan spent time reviewing Villatoro's husband's criminal records to determine if the offense met the petty offense exception under immigration law, in which event it would not bar lawful permanent resident status. Eventually, Akpan decided that it did meet the exception.

On February 23, 2016, Akpan and Villatoro entered into a written contract for legal services. The agreement provided that the necessary immigration work would be performed for a flat fee of $4000. An initial payment of $1500 was made at the signing of the contract. The remaining balance was to be paid in monthly installments of $500, beginning April 1. Akpan did not keep time records of the engagement.

Akpan deposited the $1500 into his business account, not into a trust account.[1] Akpan maintains that prior to the signing of the contract, he had completed ten hours of legal work, having met with Villatoro at her workplace four times. Thereafter, through September 2016, Akpan received additional $500 checks approximately once a month. Typically, Akpan would receive these payments from Villatoro when he was meeting her at her office about the representation. Akpan deposited each of these checks into his business account; he claims he had earned them at the time of receipt.

---

[1]Akpan had a trust account but testified that he did not use it much. Past clients rarely paid in advance. It was common practice for his clients only to pay after services were provided. Akpan testified that if he had received the full $4000 at the initial meeting, he would have put it in the trust account.

Akpan further testified that the market rate for the legal services he was to provide usually ranged from $7000 to $9000. He charged Villatoro less because of their personal relationship.[2] The parties' written agreement allowed Akpan to bill for expenses such as long-distance telephone calls, although he testified he never charged these types of expenses to flat-fee clients.[3]

Akpan's representation of Villatoro lasted over a year, through late 2017. Over the course of representation, Villatoro was unreliable in providing the necessary documentation and completing forms to support the immigration application for her husband. Akpan emailed Villatoro a list of needed documentation near the outset of the representation, but the vast majority of these items were never provided. Akpan also asked Villatoro to fill out certain forms in handwriting; she did so only in part. Akpan started the process of generating typed versions of the forms, but he could not finish the job.

In total, Akpan estimates that he spent over forty hours working on Villatoro's case. At least thirty-two of those forty hours involved driving back and forth to Villatoro's place of business. Villatoro's office was about an hour's drive away by car.[4]

At some point during the representation, Villatoro discovered that her husband was having an extramarital affair. Villatoro requested that Akpan cease all work on the immigration application because she was no longer willing to be her husband's required sponsor.

[2]The figure "$7000" was preprinted on the agreement form but had been stricken out.

[3]Filing fees are the client's responsibility. Akpan disclosed these in writing to the client at the outset of the representation.

[4]Akpan did not charge for mileage for the trips. Akpan explained that Villatoro was unwilling to travel to his office. The only purpose of these trips was to work on Villatoro's immigration matter.

Villatoro attempted to retain Akpan to obtain a divorce from her husband. Knowing that he had a conflict of interest and was not licensed in Texas, Akpan referred Villatoro to other attorneys. When Villatoro specifically asked Akpan to represent her in the divorce, Akpan declined.

At that point, in June 2017, Villatoro requested a full refund of the $4000 she had paid Akpan under the flat-fee immigration services agreement. Akpan refused. A series of communications between the parties followed. At one point, Villatoro texted Akpan and suggested he "[t]ake out the justif[ied] amount for [his] work and the rest refund it." Akpan didn't specifically respond to this request. Akpan told Villatoro their agreement was a flat-fee agreement and he wasn't required to keep hours.

Villatoro eventually filed a complaint with the Texas attorney disciplinary authority. She was told to refile in Iowa because Akpan was licensed in Iowa rather than Texas. Villatoro did so. Villatoro also filed a small claims lawsuit in Texas to recover the $4000. That lawsuit was still pending at the time of the commission hearing in this matter.

During the course of representation, Akpan never provided Villatoro or her husband with an itemization of legal services performed under the flat-fee agreement. Akpan acknowledged that in the past, when a flat-fee representation ended before he had performed all necessary work, he had not kept the entire fee amount. Instead, Akpan and the client would work together to determine the appropriate amount of money to be refunded. This calculation would be based on the amount of work Akpan had performed. Here, Akpan never refunded any of the $4000 to Villatoro.

Akpan provides immigration law services at no or reduced cost to members of the Nigerian immigrant community in the Houston area and to other persons of limited means. Akpan has no prior disciplinary record.

The Board brought a complaint against Akpan alleging violations of Texas Disciplinary Rules of Professional Conduct 1.04(a), (b), and (c); 1.14(a), (b), and (c); and 1.15(a) and (d). In October 2019, the case proceeded to a two-day hearing in Des Moines. Akpan appeared in person for the hearing. Villatoro did not. Akpan objected to the Board's presentation of Villatoro's testimony by videoconference.

The Board's first witness was Joann Barten, an immigration attorney from Ames. She provided a thorough explanation of the procedure she has used during her career as an immigration lawyer to prepare and submit an I-130 form and an I-485 form. Barten stated that in her practice she uses both flat fees and hourly rates. During the time Akpan was working for Villatoro and her husband, Barten's hourly rate was $195 per hour. (Akpan's hourly rate at that time was $150.) On a flat-fee basis, Barten would have charged $3500 for the specific project that Akpan undertook for Villatoro and her husband. However, Barten would have charged extra for the in-person marriage interview with United States Citizenship and Immigration Services (USCIS) as well as for filing fees and expenses. According to Barten, in the past, a client of hers who received services similar to those sought by Villatoro had to pay $15,000.

When asked if she has ever refunded money from a flat-fee arrangement, Barten provided the following example,

> [If w]e're at [$]2,800 in time, or [$]2,500 in time[,] I do not refund the leftover if [the application] is filed.
>
> . . . .
>
> . . . Because that's part of the case[,] I'm agreeing to cap it. However, if [the client] cancel[s] the case or I have to remove myself because of a conflict of interest, then they have to pay up to that point my hourly rate, and then I refund.

Barten also stated that Akpan had completed only ten to fifteen percent of the work at the time Villatoro asked him to stop.

Villatoro, as noted, testified at the hearing by videoconference over Akpan's objection. In that testimony, Villatoro conceded she had not provided to Akpan all the documentation he wanted. Villatoro also testified that she filed for a divorce from her husband in 2017, but she put the divorce on hold to help her husband obtain permanent resident status. Villatoro's husband received a green card in July 2019 using a different attorney than Akpan. Villatoro conceded that, during the interview with USCIS, she did not disclose to the immigration authorities that she was going through a divorce.

Akpan also testified at the hearing in his own defense.

Following the hearing, the commission found that Akpan had committed most of the alleged rule violations. With respect to Texas rule 1.04(a), it concluded that it was "unconscionable" for Akpan to charge $4000 in light of the "minimal" work completed. Thus, Akpan had violated Texas rule 1.04(a) by charging an unconscionable fee.

The commission also found that Akpan had violated Texas rule 1.14(a) by taking client funds into income before they had been earned. With respect to the initial $1500, the commission relied on the wording of the flat-fee agreement. As the commission explained, "[T]he parties' expectation as objectively set forth in the Agreement was that none of the services that may have been provided by Akpan prior to signing the Agreement were covered under the Agreement." Therefore, although the commission did not dispute Akpan had already performed ten hours of legal work when he received the $1500, in the commission's view, the contract precluded Akpan from having earned those funds when he deposited them in his business account.

Turning to the subsequent $500 checks, the commission found that Akpan had not earned most of these amounts when he deposited them in his business account. In this regard, the commission took the position that Akpan could not charge for travel time. After deducting for travel time, the commission found that Akpan had not performed more than five hours of actual legal work following the execution of the February 2016 contract. This meant that many of the remaining $500 installments had not been earned when they went into Akpan's business account.

The commission also found that Akpan had violated Texas rule 1.14(c) by not segregating funds pending resolution of the parties' dispute and rule 1.15(d) by not refunding a portion of the $4000. The commission rejected the other charges against Akpan.

The commission recommended that Akpan be suspended not less than sixty-one days and that he complete at least 4.75 hours of continuing legal education (in certain designated areas) before being allowed to reinstate his license.

Akpan appealed. He challenges the admission of Villatoro's testimony by videoconference, the commission's recommendations as to rule violations, and the recommended sanction.

## II. Standard of Review.

"We review attorney disciplinary proceedings de novo." *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Turner*, 918 N.W.2d 130, 144 (Iowa 2018) (quoting *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Silich*, 872 N.W.2d 181, 188 (Iowa 2015)). "The Board has the burden of proving the attorney's misconduct by a convincing preponderance of the evidence." *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Lubinus*, 869 N.W.2d 546, 549 (Iowa 2015). This standard "places a burden on the Board that is higher than the burden in civil cases but lower than the burden in criminal

matters." *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Eslick*, 859 N.W.2d 198, 201 (Iowa 2015) (quoting *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Barnhill*, 847 N.W.2d 466, 470 (Iowa 2014)).

"We may impose a greater or lesser sanction than what the commission has recommended upon proof of an ethical violation." *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Mathahs*, 918 N.W.2d 487, 489 (Iowa 2018). "The commission's findings and recommendations do not bind us, although we respectfully consider them." *Id.*

### III. Testimony of the Complaining Witness by Videoconference.

Our court has not previously had to decide whether a witness may testify by videoconference or telephone in an attorney disciplinary proceeding over the responding attorney's objection. In *Iowa Supreme Court Attorney Disciplinary Board v. Muhammad*, a case that resulted in a license revocation, a former client living in Washington testified telephonically. 935 N.W.2d 24, 25–26, 28 (Iowa 2019). However, no objection was raised by the attorney to this procedure. *Id.* at 28.

In *State v. Rogerson*, our court stated that in criminal cases, only face-to-face testimony "fully protects a defendant's Sixth Amendment rights." 855 N.W.2d 495, 504 (Iowa 2014). "[B]efore permitting a witness to testify via two-way videoconference, the court must make a case-specific determination that the denial of the defendant's confrontation right is necessary to further an important public interest." *Id.* at 505. We added in *Rogerson* that "social pressure to tell the truth can be diminished when the witness is far away rather than physically present with the defendant in the courtroom." *Id.* at 504.

In an equitable civil proceeding, we held that a trial court abused its discretion in allowing a witness to testify by telephone over objection. *See In re Estate of Rutter*, 633 N.W.2d 740, 746 (Iowa 2001). We noted the

legislature has authorized telephonic testimony in certain specific circumstances. *Id.* "There is no rule or statutory provision, however, that would allow witnesses to testify telephonically in equitable proceedings in general." *Id.* For this reason, in *Rutter*, we disregarded the testimony of the challenged witness. *Id.*

Concerning grievance commission procedure, Iowa Court Rule 36.17(6) states, "The presentation of evidence must conform to the Iowa Rules of Civil Procedure and the Iowa Rules of Evidence." Rule 36.17(2) further provides that witnesses other than character witnesses for the respondent "must testify at the hearing after administration of an oath or affirmation by a grievance commission member or other person authorized by law to administer oaths, and their testimony must be officially reported by a duly qualified court reporter." *Id.* r. 36.17(2).

Perhaps most importantly, rule 36.17(5) provides that the respondent attorney has the right "to be confronted by witnesses." *Id.* r. 36.17(5). This language echoes the phrasing of the Confrontation Clause of the Sixth Amendment and article I, section 10 of the Iowa Constitution. As a matter of English and as a matter of Latin, the word "confrontation" refers to a face-to-face meeting. *See Coy v. Iowa*, 487 U.S. 1012, 1016, 108 S. Ct. 2798, 2800–01 (1988).

We have found instances where other jurisdictions have allowed testimony by videoconference or telephone over objection in attorney disciplinary proceedings. In *In re Disciplinary Proceedings Against Nunnery*, an attorney had his legal license revoked for seventeen counts of professional misconduct. 798 N.W.2d 239, 242 (Wis. 2011) (per curiam). In his appeal before the Wisconsin Supreme Court, the lawyer asserted that the disciplinary proceeding referee erred in allowing the telephonic

testimony of two clients, thereby compromising his constitutional rights. *Id.* at 243. The court disagreed, ruling that "[a] referee's decision to permit telephonic testimony is a discretionary determination that will be overturned only if the referee erroneously exercised his discretion." *Id.* at 244–45. The court relied on a general Wisconsin statute allowing video and telephonic testimony in civil proceedings under certain circumstances. *Id.* at 245. Under that statute, a series of factors can be considered. *Id.* The court noted that the client-witnesses resided in Texas and Louisiana. *Id.* The court further noted that the Wisconsin Office of Lawyer Regulation had provided an affidavit outlining in great detail the travel costs the office would incur to bring the witnesses to Wisconsin and that the attorney had not responded to the affidavit. *Id.* Considering all the circumstances, the Wisconsin Supreme Court found no abuse of discretion in allowing the telephonic testimony. *Id.*

In *Attorney Grievance Commission of Maryland v. Agbaje*, the Maryland Court of Appeals allowed video testimony by a client-witness in a disciplinary proceeding. 93 A.3d 262, 269 (Md. 2014). That case also involved an attorney assisting a client in securing a green card. *Id.* at 270. The attorney had been actively pursuing lawful permanent resident status for the client at the same time that he entered into discussions with the client about investing in the attorney's real estate business. *Id.* at 270–72. Because of his actions, the bar counsel recommended disbarment, and the Maryland court concluded disbarment was the appropriate sanction. *Id.* at 284, 286.

One of the lawyer's primary arguments on appeal was that the client should have been required to appear in person for the disciplinary hearing. *Id.* at 275. By then, the client had relocated back to the United Kingdom. *Id.* at 269. The attorney pointed out that residents of the United Kingdom

are allowed to travel freely to the United States without a visa. *Id.* at 275. Still, considering all the facts, the court concluded that real-time videoconference testimony constituted a reasonable alternative to in-person testimony. *Id.* at 275–76.

These cases illustrate that some other jurisdictions have allowed testimony by videoconference. However, in Iowa, the grievance commission rules do not permit live testimony by videoconference under normal circumstances. Iowa's grievance commission rules specifically give the responding attorney a right to "confront" witnesses testifying against the attorney. Iowa Ct. R. 36.17(5).

Villatoro could not have been subpoenaed from Texas to Iowa for the hearing. The record does not indicate whether the Board tried to get her to appear voluntarily by paying her travel expenses. At the hearing, Villatoro testified that she could not leave home because she had a five-year-old child to tend to.

Prior to the hearing, the Board sought permission to present Villatoro's live testimony by telephone. Akpan objected. The commission chair thereupon took a reasoned approach and allowed Villatoro to appear at the hearing by videoconference. The commission chair acknowledged that the Board could have been directed to depose Villatoro in Texas and present her deposition testimony at the hearing. That would have afforded Akpan a right of personal confrontation. However, as the chair emphasized, that practice would not have allowed commission members to ask questions of Villatoro.

We share the commission's view that it can be valuable for commission members to ask questions of witnesses. However, chapter 36 of the Iowa Court Rules does not mention such questioning. At the same time, rule 36.17(5) specifically gives the responding attorney a right of

confrontation. Iowa Ct. R. 36.17(5). Therefore, we conclude the express right of confrontation under rule 36.17(5) must prevail over the commission's ability to question a witness at hearing.[5]

The Board argues there was "good cause" for Villatoro's testimony by videoconference because the arrangement allowed the commission members to question her directly. But that is not really a good-cause exception; it would swallow the rule providing for a right of confrontation.

Notably, the hearing in this case took place in early October 2019, well before the COVID-19 pandemic. We are not deciding what effect rule 36.17(5) would have under COVID-19 pandemic conditions.[6]

In light of our determination that the commission abused its discretion in admitting videoconference testimony from the complaining witness over the responding attorney's objection, we need to decide on the appropriate remedy. The commission contends it relied "almost exclusively upon the testimony of [Akpan] and the documentary evidence in reaching its decision" and that we should consider any admission of Villatoro's testimony to be "harmless error" if an error occurred. The Board asks us to strike Villatoro's testimony and decide the case on our de novo review of the rest of the evidence if we conclude receipt of her video testimony was in error. Akpan does not object to this procedure, and we will follow it here.

---

[5]Our conclusion is bolstered by rules 36.17(2) and (6). Rule 36.17(2) makes clear that witnesses generally must testify "*at the hearing.*" Iowa Ct. R. 36.17(2) (emphasis added). Additionally, according to rule 36.17(6), the presentation of evidence must conform to the rules of civil procedure and evidence. *Id.* 36.17(6).

[6]We are not holding there is a constitutional right to confront witnesses in an attorney disciplinary proceeding. Today's decision is based on application of the rules in Iowa Court Rules chapter 36.

**IV. Violations.**

We now turn to disciplinary rule violations alleged by the Board. Some preliminary discussion on conflict of laws is appropriate. As an Iowa licensee who practices federal law in Texas, Akpan is subject not only to *our* disciplinary authority but also to the Texas disciplinary rules. *See* Iowa Ct. R. Prof'l Conduct 32:8.5(a) ("A lawyer admitted to practice in Iowa is subject to the disciplinary authority of Iowa, regardless of where the lawyer's conduct occurs."); *id.* 32:8.5(b)(2) ("[T]he rules of the jurisdiction in which the lawyer's conduct occurred . . . shall be applied to the conduct."). Texas, like Iowa, uses the Model Rules of Professional Conduct as a platform. Thus, Texas's rules are similar, but not identical, to ours. We follow Texas's interpretations of its own rules in determining whether a violation occurred.

**A. Unconscionable Fee.** Texas Disciplinary Rule of Professional Conduct 1.04(a) states, "A lawyer shall not enter into an arrangement for, charge, or collect an illegal fee or unconscionable fee. A fee is unconscionable if a competent lawyer could not form a reasonable belief that the fee is reasonable."

Iowa, notably, prohibits "unreasonable fee[s]." *See* Iowa R. Prof'l Conduct 32:1.5(a). Texas, however, sets the bar for an ethical violation higher. Comment 1 to Texas Disciplinary Rule of Professional Conduct 1.04(a) explains,

> The determination of the reasonableness of a fee, or of the range of reasonableness, can be a difficult question, and a standard of "reasonableness" is too vague and uncertain to be an appropriate standard in a disciplinary action. For this reason, paragraph (a) adopts, for disciplinary purposes only, a clearer standard: the lawyer is subject to discipline for an illegal fee or an unconscionable fee. Paragraph (a) defines an unconscionable fee in terms of the reasonableness of the fee but in a way to eliminate factual disputes as to the fees reasonableness.

In the words of one Texas court: "[T]he drafters of the rules note in the comments to the rule that the standard for compliance is a higher standard than reasonableness." *Gipson-Jelks v. Gipson,* 468 S.W.3d 600, 605 n.3 (Tex. App. 2015).

The commission did not find that Akpan *charged* an unconscionable fee. We agree with the commission here. Akpan's $4000 flat fee for the anticipated work was not excessive.[7]

However, the commission found that Akpan *collected* an unconscionable fee because he retained the full $4000 despite having made little progress toward the final preparation of the I-130 form and the I-485 form when he was discharged by Villatoro. As noted by the commission, most of the time that Akpan devoted to the matter was travel time. Also, Akpan's meetings with Villatoro involved repeating "the same discussion regarding obtaining the necessary documents."

We disagree, though, that these facts make it unconscionable for Akpan to receive $4000. It appears Texas would allow an attorney to collect a quantum meruit payment when discharged by the client before completing the work set forth in a flat-fee agreement. *See Hoover Slovacek LLP v. Walton,* 206 S.W.3d 557, 561–62 (Tex. 2006) (applying this principle to contingent fee agreements).

A recent relevant precedent (although not from Texas) is *In re Gilbert,* 346 P.3d 1018 (Colo. 2015) (en banc). Gilbert was also an immigration case. *Id.* at 1019. There, the clients paid $2950 toward an attorney's $3550 flat fee and then discharged her. *Id.* at 1020. The attorney kept

---

[7] *See Wilson v. Henderson,* No. 05-18-00714-CV, 2019 WL 4635171, at *6 (Tex. Ct. App. Sept. 24, 2019) (upholding $10,000 flat fee); Pro. Ethics Comm. for the State Bar of Tex., *Opinion No. 611, September 2011,* 74 Tex. B.J. 944, 944 (2011) ("It is important to note that the Texas Disciplinary Rules of Professional Conduct do not prohibit a lawyer from entering into an agreement with a client that requires the payment of a fixed fee at the beginning of the representation.").

$1114.14, asserting that she was entitled to recover 4.41 hours at her regular hourly rate of $250 for "the court appearance, travel time, research, correspondence, and the motion to withdraw." *Id.* Bar counsel challenged this, but the Colorado Supreme Court agreed there was no ethical violation. *Id.* at 1023–25. The court explained why quantum meruit is allowed in the client–attorney context:

> In the legal services context, courts applying the doctrine of quantum meruit have recognized that when a client discharges his or her attorney, the client remains obligated to pay the reasonable value of the services rendered, barring conduct by the attorney that would forfeit the attorney's right to receive a fee. At the same time, we have recognized that the trust and confidence that underlies the attorney–client relationship distinguishes this relationship from other business relationships. By allowing an attorney to recover the reasonable value of services provided, the doctrine of quantum meruit operates to preserve the client's right to discharge an attorney while preventing clients from unfairly benefiting at their attorney's expense where the parties have no express contract or have abrogated it.

*Id.* at 1023. The court said that in applying this doctrine:

> We have carried principles of quantum meruit recovery into our attorney discipline cases. Relevant here, our prior rulings indicate that, where the parties have a flat fee agreement, a discharged attorney does not violate the ethical obligation to refund unearned fees where the attorney is entitled to a portion of the fee in quantum meruit for the reasonable value of services rendered before being discharged.

*Id.* at 1024–25.[8]

There is no dispute that Akpan had devoted at least forty hours to the case when Villatoro fired him. This included time spent gathering information on Villatoro's husband's criminal matter and analyzing its

---

[8]Notably, Colorado, like Iowa and unlike Texas, prohibits fees that are merely "unreasonable," even if they are not "unconscionable." *See* Colo. R. Prof'l Conduct 1.5(a)(1).

impact.[9] It also included time spent attempting to get information and forms from Villatoro and traveling to and from her office. While the progress was slow, that was because Villatoro and her husband were not assembling the needed information. Also, it was Villatoro's choice to have Akpan travel to her office; Akpan would have preferred that Villatoro come to his office, but she declined to do so. Travel time is recoverable as a form of attorney fees in Texas. "Courts have considerable discretion in evaluating travel time, and may, in their discretion reduce working and non-working travel time." *Tex. Mut. Ins. v. DeJaynes*, 590 S.W.3d 654, 670 n.11 (Tex. App. 2019) (upholding a court's award of travel time); *see also Wilkerson v. Atascosa Wildlife Supply*, 307 S.W.3d 357, 359–60 (Tex. App. 2009) (same). We find the Board failed to prove a violation of Texas rule 1.04(a) by a convincing preponderance of the evidence.[10]

**B. Failing to Communicate the Basis for the Fee Within a Reasonable Time After Commencing the Representation.** Texas Disciplinary Rule of Professional Conduct 1.04(c) states, "When the lawyer has not regularly represented the client, the basis or rate of the fee shall

---

[9]The Board contends that time spent investigating the criminal matter was written off by agreement of the parties because it was incurred *before* the parties signed the flat-fee agreement on February 23, 2016. The Board notes that paragraph 10 provides under "commencement of representation" that "legal services will not be rendered and client's file will be placed on hold until clients make payment as described in item 7 above." The Board reads this language as a disclaimer that Akpan had provided any compensable services before February 23. However, we do not believe the quoted language is so unambiguous. Paragraph 10 can also be read as procedural: it advises the client that the attorney will not do anything else on the engagement until payment is received. Given the lofty standard for proving an unconscionable fee in Texas, we do not think the Board has made its case for exclusion of pre-February 23 time that related to completion of the matters covered by the agreement, i.e., preparation and submission of the I-130 form and the I-485 form.

[10]The Board also charged a violation of Texas Disciplinary Rule of Professional Conduct 1.04(c). We agree with the commission that this rule would not provide the basis for a separate violation. It simply sets forth factors "that may be considered in determining the reasonableness of a fee." Tex. Disciplinary R. Prof'l Conduct 1.04(c).

be communicated to the client, preferably in writing, before or within a reasonable time after commencing the representation." We agree with the commission that Akpan and Villatoro entered into the February 23, 2016 written agreement within a reasonable time after the representation had commenced, and therefore, this rule was not violated. As Akpan explained, before he charged Villatoro $4000 and delved more deeply into the representation, he wanted to do the necessary research to make sure her husband's criminal record would not prevent his getting a green card. Had he determined that Villatoro's husband was not eligible, Villatoro would not have been charged anything and the representation would not have been formalized with an agreement. A delay of this nature was reasonable. *Cf. McCleery v. Comm'n for Law. Discipline*, 227 S.W.3d 99, 105–06 (Tex. App. 2006) (finding an attorney violated Texas rule 1.04(c) by switching an indigent client from a pro bono representation to a forty percent contingency two years into the representation and on the eve of trial). There was therefore no violation of Texas rule 1.04(c).

**C. Safekeeping Client Property.** Texas Disciplinary Rule of Professional Conduct 1.14(a) requires an attorney to keep funds belonging to a client "that are in a lawyer's possession in connection with a representation separate from the lawyer's own property." Advancing the same theme, Texas rule 1.14(c) provides,

> When in the course of representation a lawyer is in possession of funds or other property in which both the lawyer and another person claim interests, the property shall be kept separate by the lawyer until there is an accounting and severance of their interest. All funds in a trust or escrow account shall be disbursed only to those persons entitled to receive them by virtue of the representation or by law. If a dispute arises concerning their respective interests, the portion in dispute shall be kept separated by the lawyer until the dispute is resolved, and the undisputed portion shall be distributed appropriately.

Tex. Disciplinary R. Prof'l Conduct 1.14(c).

Akpan does not dispute that he did not deposit any of the funds he received from Villatoro in a trust account. Nor did he provide any accounting to Villatoro when he put those funds in his business account. He claims that he had already earned each installment when he received it. This includes the initial $1500.

We agree with the commission's finding that Akpan violated Texas rule 1.14(a). The flat-fee agreement provided that Akpan was to receive $4000 for filing the completed I-130 form and I-485 form (along with necessary supporting documentation). It was not an hourly agreement and did not even mention a possible hourly rate. It did not have contractual milestones. It did not indicate that any of the payments were nonrefundable in return for Akpan giving up other employment.

Texas allows for nonrefundable retainers, but only if the retainer is paid to secure the attorney's availability and to compensate the attorney for lost opportunities. *See Cluck v. Comm'n for Law. Discipline*, 214 S.W.3d 736, 739–40 (Tex. App. 2007) (explaining that a retainer is a prepayment for services and not a "true retainer" unless it is paid to secure the lawyer's availability and to compensate the lawyer for lost opportunities). Otherwise, the money is considered a prepayment and must be held in a trust account until the services are rendered. *See id.* at 740–41 (finding that an attorney violated Texas rule 1.14(a) by not depositing a retainer in his trust account).

Accordingly, under the agreement, Akpan did not earn the fees until he filed the I-130 form and the I-485 form. While Akpan would have a claim for quantum meruit if the client discharged him (as in fact happened), Akpan had no *contractual* right to the funds until he completed the work. If Akpan wanted to collect some portion of his fee as he went

along, this should have been spelled out in the February 2016 agreement or worked out with Villatoro.

Comment 2 to Texas rule 1.14 confirms that under these circumstances the funds should have gone into a trust account:

> When a lawyer receives from a client monies that constitute a prepayment of a fee and that belongs to the client until the services are rendered, the lawyer should handle the fund in accordance with paragraph (c). After advising the client that the service has been rendered and the fee earned, and in the absence of a dispute, the lawyer may withdraw the fund from the separate account.

Tex. Disciplinary R. Prof'l Conduct 1.14 cmt. 2.

Based on the foregoing, we think Texas would likely follow something akin to the principles set forth in *Iowa Supreme Court Attorney Disciplinary Board v. Said*, 869 N.W.2d 185 (Iowa 2015). In that case, an immigration attorney and his client agreed upon a $5200 flat fee to be paid $2600 up front and the remainder in monthly installments. *Id.* at 188. We found the attorney committed ethical violations in withdrawing portions of this flat fee from his trust account before the work was completed, stating,

> We recognize withdrawal of portions of a flat fee paid in advance can present difficult questions for lawyers. Yet, these questions can be minimized by agreements that designate the times withdrawals will be made and transparent recordkeeping that justifies the withdrawal of fees.

*Id.* at 192.[11] Furthermore, the court continued,

> The facts revealed Said periodically withdrew fees with no clear connection to any milestone in the case, any specific

---

[11]It should be noted, however, that Texas apparently has no counterpart to chapter 45 of the Iowa Court Rules. The chapter 45 rules contain specific directives concerning trust accounts. Rule 45.10, in particular, governs flat fees. *See* Iowa Ct. R. 45.10. It requires advance payments of flat fees to be deposited into a trust account and allows withdrawal by the attorney only by agreement. *Id.* r. 45.10(2)–(3). Those trust account rules played a significant part in our *Said* decision. *See* 869 N.W.2d at 192–93.

> work performed, or any relationship to the services remaining to be performed. Instead, the withdrawals were more consistent with the odd and frequent withdrawals we have disapproved of in the past. Said violated Iowa Rule of Professional Conduct 32:1.15(c) in making withdrawals from the advance payment of the flat fee deposited in a trust account before he earned the portion withdrawn.

*Id.* at 193 (citation omitted). Here, Akpan never deposited the flat-fee installments into a trust account or advised Villatoro they were being deposited into his business account. Therefore, he violated Texas rules 1.14(a) and (c).[12]

**D. Properly Terminating Representation.** Two rules are at issue here. Texas Disciplinary Rule of Professional Conduct 1.15(a) requires an attorney to withdraw when discharged by a client. It is unclear why the Board alleged a violation of this rule. It did not explain in its briefing below. We agree with the commission that this rule was not violated.

The other rule is Texas rule 1.15(d). It requires the attorney who is discharged to refund "any advance payments of a fee that has not been earned." Tex. Disciplinary R. Prof'l Conduct 1.15(d). The commission found a violation of this rule.

---

[12]The commission also found that Akpan violated the last sentence of Texas rule 1.14(c) by not placing $4000 into a separate escrow once the dispute with Villatoro arose. In a sense, that horse had already left the barn because Akpan had previously taken those funds into income upon receipt, thereby violating both rule 1.14(a) and the first sentence of rule 1.14(c). Since we have already found these other violations of rule 1.14, we do not decide whether the last sentence of rule 1.14(c) imposes a further obligation on an attorney to restore funds that had been taken into income before the dispute arose.

We take the same approach regarding Texas rule 1.14(b). That rule requires "a lawyer [to] promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive." Tex. Disciplinary R. Prof'l Conduct 1.14(b). The commission found no violation here because, in its view, the rule applies only to funds received from someone other than the client. We do not address that alleged violation in light of our other determinations on rule 1.14. *Cf. Iowa Supreme Ct. Att'y Disciplinary Bd. v. Weiland*, 885 N.W.2d 198, 207 (Iowa 2016) (finding that a failure to refund a retainer can give rise to a violation of Iowa's counterpart to Texas rule 1.14(b)).

As we have already discussed in division IV.C of this opinion, Akpan should have deposited the monies he received from Villatoro in a trust account. Under the flat-fee agreement, Akpan lacked grounds to take any of those funds into income until the representation was completed, unless he had worked out another arrangement with Villatoro. In those respects, as already noted, Akpan violated Texas rules 1.14(a) and (c).

However, as discussed in division IV.A, once Villatoro discharged Akpan, he could pursue a quantum meruit recovery for work performed. In *Bennett v. Commission for Lawyer Discipline*, the Texas Court of Appeals held that no violation of Texas rule 1.15(d) occurred when an attorney refused to refund any portion of a $70,000 retainer to a client while the two were in an unresolved dispute over whether a refund was owed. 489 S.W.3d 58, 66–67 (Tex. App. 2016). The client discharged the attorney on August 3, 2011, but a fee arbitration did not result in a confirmed award to the client until July 23, 2012. *Id.* at 67. As the court explained,

> Because the question whether the fee had been earned was not settled until July 2012 at the earliest, there is no evidence that on August 3, 2011, Bennett failed to return an advance payment of fee that had not been earned.

*Id.* The same reasoning would apply here. There is a pending small claims action in Texas between Villatoro and Akpan. No judgment has been entered in that action. We therefore find no violation of Texas rule 1.15(d).

## V. Sanction.

Because Akpan is subject to our disciplinary authority, we believe that discipline is a matter for us to decide under our precedents. *See* Iowa Ct. R. Prof'l Conduct 32:8:5. Again, Texas law determines whether there were ethical transgressions; if there were, we calibrate the sanction. *Id.* (explaining that conduct that occurs in another jurisdiction is subject

to "the rules of [that] jurisdiction" but the Iowa-licensed attorney who commits such conduct is subject to our "disciplinary authority").

"There is no standard sanction warranted by any particular type of misconduct. Though prior cases can be instructive, the sanction warranted in a particular case must be based on the circumstances of that case." *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Hier*, 937 N.W.2d 309, 317 (Iowa 2020) (quoting *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Cannon*, 821 N.W.2d 873, 880 (Iowa 2012)). "Our primary purpose for imposing sanctions [is] not to punish the lawyer but to protect the public." *Id.* at 317 (quoting *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Nelson*, 838 N.W.2d 528, 542 (Iowa 2013)).

The core of Akpan's misconduct is that he received funds from a client under a flat-fee agreement, didn't put them in a trust account, and took them into income before they had been earned under that agreement. We have encountered similar situations before.

In *Iowa Supreme Court Attorney Disciplinary Board v. Nelissen*, we suspended an attorney for thirty days who received retainer funds from a client, didn't deposit all those funds in her trust account, and withdrew other funds from the trust account before they were earned and without notifying the client. 871 N.W.2d 694, 669–700 (Iowa 2015). She also misrepresented on her client security report that she was performing monthly reconciliations and ignored requests of the Board for information. *Id.* at 700. She had a past reprimand for trust account violations and also had been reminded during an audit that she needed to perform monthly reconciliations. *Id.* at 701. "For these reasons," we explained, "another reprimand would not serve the goals of the attorney discipline process." *Id.*

In *Iowa Supreme Court Attorney Disciplinary Board v. Lubinus*, we suspended an attorney for thirty days for "failing to deposit an advance fee into his trust account, transferring unearned fees out of his trust account, and failing to furnish contemporaneous accountings to his clients upon making trust account withdrawals." 869 N.W.2d 546, 547 (Iowa 2015). Notably, the attorney "*knowingly* removed unearned funds from his trust account prematurely because he was in financial difficulty." *Id.* at 553. We also commented, "When an attorney's minor trust account violations are the result of sloppiness or lack of oversight, we have levied a public reprimand rather than a suspension." *Id.* at 550. We added, "On the other hand, when an attorney has committed multiple or more systematic trust account violations, we have imposed suspensions, often of thirty days." *Id.* at 551.

In *Said*, 869 N.W.2d at 195, we likewise suspended an attorney for thirty days. There, an immigration attorney received a flat fee, put it in his trust account, but made periodic withdrawals without notice to the client and without connection to any work he was actually doing. *Id.* at 193. The attorney also missed an appeal deadline, failed to communicate with the client about the significance of the missed deadline, and made a false statement to the immigration tribunal about what he was doing to fix the missed deadline. *Id.* at 190–92. The attorney also had four prior admonitions, one of which involved "conduct similar to one of the violations in this case." *Id.* at 194.

In *Iowa Supreme Court Attorney Disciplinary Board v. Eslick*, an attorney admitted to

> failing to deposit all unearned fees and prepaid expenses into her trust account, commingling personal funds with those of her clients, failing to maintain a receipt and disbursement journal and check ledger for the trust account, failing to

> perform trust account reconciliations, withdrawing fees from the account without notifying clients, failing to maintain copies of accountings to clients, and operating with a deficiency of nearly $8000 in her trust account."

859 N.W.2d at 200. We concluded a suspension of thirty days was appropriate for this "pattern of rule violations." *Id.* at 203.

In *Iowa Supreme Court Attorney Disciplinary Board v. Mendez*, we imposed the equivalent of a sixty-day suspension on an immigration attorney who repeatedly failed to deposit both initial and subsequent installments of flat fees into his trust account. 855 N.W.2d 156, 167, 175 (Iowa 2014). The trust account violations involved multiple clients and there were other types of rule violations as well, such as unreasonable fees, failure to communicate with clients, and neglect. *Id.* at 168–72. A significant violation of our conflict-of-interest rules occurred when the attorney failed to inform a client of the need to retain new counsel after the attorney missed a deadline. *Id.* at 174. Overall, the attorney "flouted our trust account rules." *Id.* at 175.

In *Iowa Supreme Court Attorney Disciplinary Board v. Kersenbrock*, we suspended an attorney for thirty days who had systematically violated trust account rules. 821 N.W.2d 415, 422 (Iowa 2012). The attorney failed to deposit unearned retainers into a trust account, took a premature probate fee, regularly failed to perform trust account reconciliations, and falsely certified the status of her trust accounting procedures on annual client security reports. *Id.* at 419–21.

In *Iowa Supreme Court Attorney Disciplinary Board v. Denton*, we publicly reprimanded an immigration attorney who failed to deposit the payments on a flat-fee agreement in his trust account, withdrew fees before they were earned, and failed to notify his client of the withdrawals. 814 N.W.2d 548, 551 (Iowa 2012). We characterized the situation as "an

isolated violation of our ethical rules" and noted that the attorney had no history of prior ethical lapses and, additionally, had "established a trust account to avoid future infractions in the representation of Iowa clients in immigration matters." *Id.*

In *Iowa Supreme Court Attorney Disciplinary Board v. Vilmont*, we suspended for thirty days the license of an attorney who entered into an illegal fee agreement that had both an hourly rate and a minimum fee, who collected an unreasonable fee, and who took funds out of his trust account without a contemporaneous notice. 812 N.W.2d 677, 679–80 (Iowa 2012).

In *Iowa Supreme Court Attorney Disciplinary Board v. Boles*, we suspended an attorney for thirty days who repeatedly withdrew unearned fees from his trust account and failed to provide accountings to his clients. 808 N.W.2d 431, 438, 443 (Iowa 2012). The attorney also neglected one matter, failed to return unearned fees in one instance, and failed to keep disputed fees separate. *Id.* at 439–40. A number of mitigating factors were present. *Id.* at 442.

In *Iowa Supreme Court Attorney Disciplinary Board v. Parrish*, we suspended for sixty days the license of an attorney who withdrew all the fee payments made by two clients before earning many of those fees and without providing an accounting. 801 N.W.2d 580, 586–87, 590 (Iowa 2011). He also failed to refund the unearned portion of the fees even when ordered to do so by an arbitration panel. *Id.* at 587. The attorney had six prior private admonitions, some involving quite similar conduct. *Id.* at 589. There were also significant mitigating circumstances. *Id.*

In *Iowa Supreme Court Attorney Disciplinary Board v. Piazza*, we publicly reprimanded an attorney who did not deposit the flat-fee payments on a matter in his trust account, wrongly taking the position they were earned when he received them. 756 N.W.2d 690, 697–98, 700

(Iowa 2008) (per curiam). The attorney had "no history of ethical violations" and promised to comply with our rules regarding flat-fee payments in the future. *Id.* at 700.

After reviewing all these precedents, we conclude as follows. The circumstances here are clearly not as egregious as those that led to the sixty-day suspensions in *Mendez* and *Parrish.* Also, at least on this record, we do not have the systemic violations that were present in *Eslick*, *Kersenbrock*, and *Boles*—all thirty-day suspension cases. This case likewise does not involve a prior disciplinary record or other facts pointing toward greater culpability as in *Nelissen*, *Lubinus*, *Said*, and *Vilmont*, which were also thirty-day suspension cases. All in all, we think the present case is most similar to *Denton* and *Piazza*, although one could find ways to characterize the conduct in those two cases as less blameworthy. Two mitigating factors are also present here. Akpan provides low- and no-cost services to an underserved community, and he has no prior history of discipline. Considering Akpan's mitigating factors, and everything else we are required to take into account before imposing discipline, we have decided to impose a public reprimand. We remind Akpan that should he resume practicing immigration law, he will need to deposit retainers in his trust account, take them as income only when earned under the terms of the parties' agreement, and provide accountings to the client. Future ethical violations involving similar misconduct will not be treated as leniently.

### VI. Conclusion.

We publicly reprimand Akpan. We tax the costs of this action to Akpan pursuant to Iowa Court Rule 36.24(1).

**ATTORNEY REPRIMANDED.**

All justices concur except Appel, J., who concurs in part and dissents in part, and Waterman, J., who takes no part.

#20–0187, *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Akpan*

**APPEL, Justice (concurring in part and dissenting in part).**

I respectfully concur in part and dissent in part. I concur with the majority on the question of use of videoconferencing in disciplinary proceedings. I dissent on the issue of sanction and on whether at least part of the fee collected by Akpan was unconscionable. From my review of the record, I conclude a suspension is in order.

The majority opinion suggests that the $1500 paid on February 23, 2016, when Akpan and Villatoro signed the fee agreement, was earned prior to the execution of the document. As explained by the majority, most of the precontract attorney hours were travel time. The theory of the majority opinion seems to be that by signing the February 23 contract, the ten hours—mostly travel time fees—prior to the execution of the fee agreement were earned, or at least not unconscionable.

When I look at the underlying contract, I come to a different conclusion. When the full terms of the February 23 fee agreement are considered, I conclude that Akpan was not entitled to deposit the check in his business account when he received it because he was not entitled to the fees under the plain language of the fee agreement.

Paragraph 1 entitled "Date of Contract" provides the date of February 23, 2016. Paragraph 5 entitled "Legal Services Involved" simply has the entry "I-485, I-130," a reference to the applicable immigration forms. So we know that the contract commences on February 23, and the services to be rendered related to the listed immigration forms.

Paragraph 6 is entitled "Agreed Legal Fees." Here, the number $4000 is entered, followed by more contract language. The contract language states,

> Pursuant to our oral discussion and based upon the information you provided to our Law Firm. You, Rosa L

> Villatoro, agree to hire The Law Offices . . . to represent you as your attorney in the matter described in item 5 above.

So, on February 23, Villataro signed the contract for representation by Akpan containing the language "agree to hire." This is a present tense provision. There is no suggestion that Akpan was hired or entitled to any fees prior to February 23.

Paragraph 7 is entitled "Fees." It states,

> Our legal fees for the representation will be $7,000 ["7,000" scratched out and accompanied by Akpan's initials, dated February 23, 2016] excluding the filing and expenses explained in item 10 below. The fees will cover consultations with you and your authorized representatives, the opposing party and any other party that we deem necessary for effective disposition of your matter. The fees will also cover research into your legal matter. Procurements of information from government agencies and courts of law.

Note the use of future tense: fees "will cover" and "will also cover." No past tense language regarding past fees here. And there is nothing about fees covering travel time. There is, further, no "including but not limited to" language here suggesting that fees could be earned. In short, Akpan wrote a fee contract that did not include any provision for payment of fees prior to February 23 and did not expressly provide for fees related to travel time.

Paragraph 10 is entitled "Commencement of Representation." Note the use of the term "Commencement" in the title. Commencement means beginning. The title is in all bold language for emphasis. The language that follows the boldfaced title is "Client is hereby notified that legal services will not be rendered and client's file will be placed on hold until clients make payment as described in item 7 above." Plainly, when the $1500 payment is made under paragraph 7, then and only then does the representation *commence*. Not one day before.

Paragraph 15 is entitled "Entire Agreement." It is an integration clause. It states, "This Agreement contains the entire agreement of the

parties. No other agreement, statement, or promise made on or before the effective date of this Agreement will be binding on the parties."

When the terms of the contract are considered in their entirety, it is clear that the agreement is an integrated contract, that it occupies the field in regard to the terms of representation on immigration matters, that under the contract representation commenced upon payment of the $1500, and that there is no provision for payment of already earned fees, eighty percent of which were for travel time. If Villatoro had brought a breach of contract claim on the day after Akpan deposited the $1500 in his trust account, she would have been entitled to summary judgment as a matter of law.

Further, Texas law would not countenance a quantum meruit theory to justify the depositing of fees outside the fee contract. The majority is correct that when a flat-fee contract is terminated and there are no clear benchmarks, the lawyer may be entitled to quantum meruit recovery of attorney fees *for representation pursuant to the fee agreement.* This written contract covers the subject matter of representation of Villatoro on the immigration matters and is the parties' entire agreement.

In short, Akpan deposited the $1500 into his business account upon receipt. At that time, he had earned *nothing* under the contract. The contract represented the parties' entire agreement. Is it not unconscionable to take a $1500 fee paid under a contract when, according to the terms of the same contract, nothing has been earned? Indeed, although not charged, he arguably deposited the check in his business (personal) account without color of right, a revocable offense. And he certainly violated trust account rules when he failed to deposit the $1500 into a trust account to secure payment for future fees as authorized by the fee contract.

At signing, there is no evidence that Akpan told Villatoro that the $1500 was going to disappear into thin air the minute the ink was dry. And, of course, Akpan did not give Villatoro any contemporaneous notice that he was claiming the money as earned. So, in addition to taking fees not authorized by the contract, Akpan violated communication rules expressly designed to avoid sticker shock arising from travel costs and what seem to the client as spinning of wheels.

With respect to the later periodic $500 payments, post-February 23 services could be earned under the agreement. If I read the majority opinion correctly, some eight hours of actual legal work was done on the file, with the balance consisting of travel time. But while the contract had a laundry list of activities for which fees would be charged, travel time was not among them.

Do we think the drawing down of fee payments largely by travel time not explicitly authorized by the contract and where there was never a contemporaneous itemization alerting the client to the charge is okay? The client basically paid for windshield time that yielded her nothing. You can work on the plane but not in the car. Would she have taken a different approach to the representation had she known that eighty percent of her fees were going to travel? But even so, perhaps a $400 per hour rate for actual legal fees (assuming total payment of $2500 and six hours of nontravel attorney work postcontract) might not be "unconscionable" under the Texas standard under all the facts and circumstances. Tex. Disciplinary R. Prof'l Conduct 1.04(a).

Nonetheless, to me, this file has a stronger aroma than that which emanates from the majority opinion. The low social status of immigration clients does not allow lawyers to charge fees mostly for driving around town when the fee contract certainly is an integrated contract stating that

attorney representation and fee entitlements arise on February 23, 2016. And even if travel time could properly be charged at an hourly rate after February 23, the client was entitled to know this through contemporaneous statements from the lawyer.

So, I see the violations as more serious than the majority and more in line with the views of the commission. The taking of the $1500 pursuant to the fee agreement for fees allegedly earned prior to that time of execution is unconscionable by any standard. There was no entitlement to the fees under the contract, and, as the *entire agreement*, one cannot gin up some post hoc justification for the depositing of the fees as claimed by Akpan. With respect to the postsigning fee payments, the failure to follow applicable ethical rules to communicate with the client about the nature of the draw down of fees in a flat-fee matter made it impossible for the client to understand what was being done with her money. So the taking of the $1500 was unearned, and the lawyer kept secret the manner in which he claimed he had earned the fees. At the end of the day, Villatoro paid $4000, spending a lot of money on windshield time, but with little to show for it. She had no idea that most of her payments were chewed up in travel time. Whether sharp or sloppy, such practices should not be permitted in the practice of law.

I would suspend Akpan's license for thirty days based on the above considerations.